Filed 6/1/22  P. v. Malone CA5

<u>**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**</u>

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

**IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA**

**FIFTH APPELLATE DISTRICT**

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>CHAVONNE MARIE MALONE,<br><br>    Defendant and Appellant. | F081572<br><br>(Super. Ct. No. SC073461C)<br><br>**OPINION** |

**THE COURT**\*

APPEAL from a judgment of the Superior Court of Kern County.  Michael G. Bush, Judge.

Elizabeth M. Campbell, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Eric L. Christoffersen and Jennifer M. Poe, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

---

\*        Before Smith, Acting P. J., Meehan, J. and Snauffer, J.

## INTRODUCTION

In 1999, petitioner Chavonne Marie Malone pled nolo contendere to the first degree murder of Walter P.[1] (Pen. Code,[2] § 187; subd. (a); count 5), the first degree murder of Glenn N. (§ 187, subd. (a); count 9), and the attempted murder of Terry S. (§§ 187, subd. (a), 664; count 1).[3] As to count 5, petitioner admitted the special circumstances that petitioner had been convicted of more than one offense of murder in the first or second degree (§ 190.2, subd. (a)(3)) and that petitioner committed the murder while engaged in the commission or attempted commission of robbery (§ 190.2, subd. (a)(17)(A)) and kidnapping (§ 190.2, former subd. (a)(17)(ii)).[4] As to count 9, petitioner admitted that petitioner committed the murder while engaged in the commission or attempted commission of robbery (§ 190.2, subd. (a)(17)(A)), burglary (§ 190.2, subd. (a)(17)(G)), carjacking (§ 190.2, former subd. (a)(17)(xii)), and a firearm enhancement (§ 12022.5, subd. (a)).[5] As to count 1, petitioner admitted a firearm enhancement pursuant to section 12022.5, subdivision (a). As to count 9, the trial court sentenced petitioner to a term of life without the possibility of parole and imposed a consecutive 10-

---

[1] Pursuant to California Rules of Court, rule 8.90, we refer to some persons by their first names. No disrespect is intended.

[2] All further statutory references are to the Penal Code unless otherwise specified.

[3] Petitioner was convicted of additional offenses and enhancements, as described below.

[4] At the time petitioner committed the offenses and admitted to the kidnapping special circumstance allegation, section 190.2, subdivision (a)(17)(ii) had been amended to its current form, subdivision (a)(17)(B). (Stats. 1995, ch. 478, § 2.) In the information, subsection (B) was crossed out and replaced, by interlineation, with subsection (ii). It appears to be a clerical error.

[5] At the time petitioner committed the offenses and admitted to the carjacking special circumstance allegation, section 190.2, subdivision (a)(17)(xii) had been amended to its current form, subdivision (a)(17)(L). (Stats. 1995, ch. 478, § 2.) In the information, subsection (L) was crossed out and replaced, by interlineation, with subsection (xii). It appears to be a clerical error.

2.

year term for the firearm enhancement (§ 12022.5, subd. (a)). As to count 5, the trial court sentenced petitioner to a concurrent term of life without the possibility of parole. As to count 1, the trial court sentenced petitioner to a concurrent term of life with the possibility of parole and imposed a 10-year term for the firearm enhancement (§ 12022.5, subd. (a)).

In 2019, petitioner filed a petition for resentencing on her murder convictions pursuant to section 1170.95. The court summarily denied the petition at the prima facie stage without providing a statement of reasons.

On appeal, petitioner contends the trial court violated her due process rights by failing to issue an order to show cause and failing to hold a hearing before engaging in judicial factfinding. Additionally, petitioner contends the trial court erred in engaging in premature factfinding at the prima facie stage. Petitioner further contends remand for additional proceedings is required because the trial court erred in failing to provide a statement of reasons for denying her petition without issuing an order to show, which is now required under section 1170.95, subdivision (c). Finally, petitioner contends the special circumstance findings cannot establish her ineligibility for resentencing because the law regarding felony murder has changed since her plea.

We conclude petitioner did not have a constitutional right to an order to show cause or evidentiary hearing because the special circumstance findings establish she in ineligible for resentencing as a matter of law. Although, it is unclear from the record whether the trial court engaged in improper factfinding, we conclude the trial court erred in failing to provide a statement of reasons for denying the petition without issuing an order to show cause, however, we likewise conclude petitioner was not prejudiced by this error because the special circumstance findings establish petitioner is ineligible for resentencing relief as a matter of law. Accordingly, we affirm the trial court's order denying resentencing relief pursuant to section 1170.95.

## FACTUAL AND PROCEDURAL BACKGROUND

The facts are from our unpublished opinion in petitioner's prior petition for writ of mandate and/or prohibition.[6]

> "Early on the morning of December 7, 1997, Terry S[.] (who was confined to a wheelchair) was driving his 1992 blue Plymouth Voyager down Stockton Boulevard in Sacramento when he saw a female waving at him. Since it was raining, he pulled over to see if she needed a ride. She was getting into his vehicle when he heard a male voice. As he turned to look, his driver's door opened and a man was standing there, pointing a gun at him. The man told him to get in the back. The man also told the woman to get in the back; both she and [Terry] did so. At that point, a third person, who had been outside on the passenger side of the vehicle, got into the front seat and the man handed this person the gun.

> "After everyone got into the car, the man talked briefly to [Terry], then drove around for about 15 minutes. At some point, the man took [Terry]'s watch. Eventually, the man pulled over into a parking lot, took out the wheelchair, and ordered [Terry] into it. After [Terry] complied, the man got a scarf from the vehicle and began to choke [Terry]. Before he lost consciousness, [Terry] saw one of the others — he believed it was the female who had been sitting in back — going through his briefcase. When [Terry] awakened, it was raining and he was covered in blood. His van and personal property, including several credit cards, were gone. The van was later found at a car wash in Bakersfield.

> "On December 9, 1997, Walter [P.], who worked at a car wash in Kern County, was found dead in a drainage ditch in a rural area approximately 15 miles south of Bakersfield. He had been shot in the arm and chest. His vehicle was found broken down on the side of Interstate 5 in Fresno County, approximately 30 miles south of Santa Nella.

> "On December 11, 1997, Glenn [N.] was found dead in [a room in a motel] in Santa Nella, Merced County. At least 17 lacerations, consistent with being hit with the butt of a gun, were found on his head. The cause of death was asphyxia by smothering. His vehicle was later found in Sacramento. It had been destroyed by fire.

---

[6] We provide these facts for background purposes because they were cited by petitioner in her opening brief. However, we do not rely on these facts in resolving the issues presented in this appeal. (See § 1170.95, subd. (d)(3).)

"[Defendants] were arrested on December 20, 1997. All three subsequently waived their rights and gave statements to Sacramento Police Detective Thorgorimson.

"In his statement, [Charles Henry] Jones related that [Tracee Beatrice] Ward[7] was his girlfriend and that they were living together, while [petitioner] was Ward's friend. Jones said that [petitioner] had come to him and Ward and said she had a friend in California City whom she wanted to visit. They discussed how they would get to California City; they talked about going out to Stockton Boulevard and having the two women act as prostitutes so they could get a car. Jones indicated that all three of them discussed this plan and agreed to it.

"The night before the [Terry] incident, the three walked from Ward's house to Stockton Boulevard. Ward got one 'date,' but this person was scared off when he saw Jones in an alley. The three were returning home when [Terry]'s van pulled into a parking lot, and Ward went up to it and got in. Jones and [petitioner] approached the vehicle, and Jones walked up to the driver's door. Ward signaled to him that it was unlocked, so Jones opened the door, pointed the gun at [Terry], and told him to get in the back. During this time, [petitioner] had a knife, which she had taken for protection in case something went wrong.

"Jones said that he and the two women had planned to act as if Jones was also robbing Ward, so he had her get in the back of the van. Jones and [petitioner] got into the front and Jones handed [petitioner] the gun. Jones then began to drive. Eventually, he got out and had [Terry] get into the wheelchair while [petitioner] pointed the gun at [Terry]. Jones then took a scarf Ward was wearing and began to choke [Terry]. [Petitioner] urged Jones to shoot, but Jones declined because of the noise. He choked [Terry] until the latter stopped struggling. Then, unsure whether [Terry] was dead, Jones took the knife that [petitioner] had had earlier and stabbed [Terry] in the neck. As Ward shouted at him to hurry up, he also struck [Terry] over the head a couple of times with a helium tank. [Defendants] then drove off in the van, leaving [Terry] there.

"[Defendants] drove the van to an apartment complex, where they disposed of the wheelchair. They then took some bags out of the van and walked across the street to Ward's and Jones's residence. Around 1 p.m. on December 7, they headed to California City in the van. During the trip, they used [Terry]'s credit cards to purchase gas and alcohol.

---

[7] Jones and Ward are not parties to this appeal.

5.

"[Defendants] stayed with [petitioner]'s friend in California City and spent some time in Bakersfield, then headed home on December 9. They decided that they did not want to drive the van back to Sacramento, so they needed a new car. They saw a brown Pontiac in a car wash parking lot and decided to try to get that vehicle.

"[Petitioner] went up to a man who was working at the car wash (Walter [P.]), said they were having car trouble, and asked for directions. While [Walter] was outside the van talking to them, Jones pointed the gun at him and told him to get into the back of the van. [Walter] complied; Jones took his car keys and asked if the brown car belonged to him. When [Walter] said yes, Jones handed the gun to Ward and went to see whether the keys actually fit the car. While Jones was doing this, he saw a commotion in the van and discovered that [Walter] had gotten hold of the barrel of the gun and was struggling with Ward and [petitioner]. Jones began striking [Walter] in the head with his fists and yelling at him to let go of the gun. Eventually, [Walter] did so. Jones then got into the van and drove to a field somewhere in Bakersfield. During the drive, he took over $100 from [Walter] and put a bungee cord around [Walter]'s feet. Jones had him get out, still tied, in a farm area. He then shot [Walter], who rolled into a ditch. Before Jones got back into the van, he saw [Walter] laying on the ground, shaking and clutching himself. Jones and the two women then drove back to the car wash, transferred their possessions from the van to the brown Pontiac, and headed for Sacramento in [Walter]'s car.

"During the trip, the car kept overheating and smoking. The trio, who had to pull over several times, eventually decided to abandon the vehicle. They hitchhiked to a [motel] in Santa Nella (which is located in Merced County), where they rented a room using cash obtained from [Walter]. They were unable to find a way to get home by making telephone calls or getting a bus ride, so Jones indicated that they needed to get a vehicle.

"[Defendants] discussed how they would find someone else who had a car, and they talked about taking a vehicle from someone who was checking into the motel. [Glenn N.] was driving a white car; Jones saw him check in, and he learned the number of [Glenn]'s room when [Glenn] asked him to point out the room's location. Jones discussed the incident with Ward and [petitioner], then the three of them walked over to [Glenn]'s room. Jones had the gun, while [petitioner] was wearing a scarf. When they reached the room, the door was open. Jones walked inside; as he did so, [Glenn] turned around and began yelling at him. Jones threw down the gun, pushed [Glenn] down on the bed, and started struggling with him

6.

while trying to hold him down. Jones told [petitioner] to hit [Glenn] over the head with the gun, and he had the women place a plastic bag over [Glenn]'s head. While [petitioner] was hitting [Glenn] over the head, Ward covered [Glenn]'s mouth with the scarf. Because [Glenn] was making so much noise, Jones directed [petitioner] to turn on the television to cover the sound. Jones recalled blood squirting onto Ward's clothing or face. When [Glenn] continued to struggle even after the bag was placed over his head, they placed a pillow over his head. [Petitioner] held the pillow over his face for quite some time. Eventually [Glenn] stopped struggling. Jones picked up his arm and, when it fell limply to the bed, knew he was dead. The three then returned to Sacramento in [Glenn]'s vehicle.

"[Petitioner]'s account of [defendant]s' gaining access to [Terry]'s vehicle was very similar to that of Jones. She recalled Jones saying that if the women posed as prostitutes, they would 'jack somebody for a car.' [Petitioner] agreed to this plan, although she said she did not know why they needed a car. During the carjacking, Jones handed [petitioner] the gun and told her to point it at [Terry], which she did. She held the gun the entire time they were driving. She said she went along with Jones and Ward so she could 'be down' for them.

"[Petitioner] said that after Jones got the wheelchair out of the van and got the man in the wheelchair, Jones asked [Terry] if he had any money and went through [Terry]'s pockets. She did not see Jones take anything. [Petitioner] said that Jones obtained a scarf from Ward and started choking [Terry]. During the struggle that ensued, she believed Jones was trying to kill [Terry], but she did not ask or tell him to stop. Jones then got the knife which [petitioner] had been carrying that evening and stabbed [Terry]. He subsequently handed the knife back to her and, when they got back into the van, he took the knife and wrapped it up in the scarf. They then returned to the apartment complex, and [petitioner] went to church with her mother.

"After church, Jones and Ward picked up [petitioner] and they left for California City in [Terry]'s vehicle. During the trip, they used [Terry]'s credit card in Fresno and Kern Counties. [Petitioner] visited her friend in California City, then they drove to Bakersfield. She fell asleep in the van; when she awakened, they were at the car wash. Jones said they were going to use a bungee cord in the back of the van to tie up the man [Walter] at the car wash, and that they were going to take him somewhere. [Petitioner] then approached [Walter] and asked him for directions. When [Walter] walked back over to the van and began talking to Jones, Jones pushed him inside the van. [Petitioner] got into the driver's seat; Ward had the gun; and Jones took [Walter]'s keys and money.

7.

"While Jones was over at [Walter]'s vehicle, [Walter] grabbed the gun from Ward and they all began struggling for it. Jones came back and started hitting [Walter] in the head. Eventually, [Walter] let go of the gun. [Petitioner] then drove them in [Terry]'s van to a remote area, where she stopped and Jones got out and had [Walter] (whose feet were tied) get out. [Petitioner] assumed [Walter] got on his knees because she had seen him standing at a certain level and later could not see him. Jones talked to him for about five minutes, and she heard Jones say that he was not going to shoot [Walter]. Later, she heard [Walter] say he thought Jones was not going to shoot him, then she heard the gun go off. [Petitioner] did not tell Jones not to shoot. She saw [Walter] lying on the ground, shaking. [Defendants] then returned to the car wash in the van and transferred their belongings to, and took, [Walter]'s car.

"[Petitioner] said they headed toward Sacramento, but the car kept overheating. Eventually, they had to abandon it. After they hitchhiked to the [motel], Jones initiated a discussion about doing another carjacking so they could get back to Sacramento. [Petitioner] was involved in that discussion. Jones left the room, then returned a short time later to tell the other two about a man [Glenn] who had just checked in and who had a nice white car. Jones knew the location of his room. Jones then suggested they bring a scarf, which they had gotten from the trunk of [Walter]'s car, as well as some rope they had taken from the same vehicle.

"Ward took some rope and the scarf, then she and Jones pretended to get ice while they waited for [Glenn] to leave the motel office. When he came out, they watched him get into his car and drive to the back of the motel, then [defendants] went over to his room. Jones reached the room first; when [petitioner] came around the corner, she heard [Glenn] yelling for help. When [petitioner] and Ward entered the room, Jones was already inside. When [petitioner] went inside, Jones told her to turn up the television so it would cover some of the noise [Glenn] was making. As he struggled with [Glenn], Jones told [petitioner] to take the scarf Ward had and to cover [Glenn]'s mouth with it to quiet him. [Petitioner] did so. At the time, she thought Jones was going to kill [Glenn]. Jones then handed her the gun, and Ward went outside to make sure nobody was coming. Ward returned a few minutes later and held her hand over [Glenn]'s mouth. At some point, Jones directed [petitioner] to strike [Glenn] in the head with the gun, and she did this three or four times. Jones then asked her for a plastic bag, which she took from a garbage can. Jones put the bag over [Glenn]'s head and Ward placed a pillow over [Glenn]'s face, but he did not stop struggling and making noise. [Petitioner] then came over and held the pillow over [Glenn]'s head for about five minutes, until she knew he

8.

was dead. Ward and [petitioner] then left the room. Sometime during these events, [petitioner] personally took [Glenn]'s watch.

"Ward came to [petitioner] a little later and told her that Jones had moved [Glenn]'s car to [a fast food restaurant]. They then packed up their things and put them in the car. [Petitioner] took some bloody towels and a bloody sheet from [Glenn]'s room. [Defendants] subsequently drove to Sacramento. In that county, [petitioner] and Jones took the vehicle and burned it in order to conceal any fingerprints.

"In her statement, Ward related that she and [petitioner] had known each other about four years. She said it was Jones's and [petitioner]'s idea to get a car; the three of them discussed this two or three days before the [Terry] incident. The final plans were made at Ward's residence. According to Ward, she and [petitioner] both knew that Jones had a gun on the night of the [Terry] incident.

"Ward said that once [Terry] was forced from the van, Jones and [petitioner] also got out. Although Ward stayed inside the van, she saw Jones choke [Terry] with a scarf. She also saw Jones take a pocket watch off of [Terry]'s belt. [Terry]'s black briefcase, which was in the van, was taken to Ward's house. Ward accompanied Jones and [petitioner] in the van to visit [petitioner]'s friend in California City. Credit card purchases were made during the trip.

"In Bakersfield, [defendants] discussed not wanting to drive [Terry]'s van back to Sacramento because it was stolen. When they saw [Walter] at the car wash, everyone said, ' "Let's go get him." ' When they approached [Walter], Ward was supposed to tie him up while [petitioner] held the gun, but [petitioner] handed the gun to Ward. Ward told [petitioner] that she could not shoot anybody and, when she did not pay attention to [Walter], he tried to take the gun from her. A struggle ensued. Jones came back over to the van and began hitting [Walter] on the head, then [Walter] let go of the gun barrel. After they took [Walter] away from the car wash, Ward remained in the van. She heard one shot, but did not see what happened. When Jones got back in the van, the three returned to the car wash and transferred their things to [Walter]'s car.

"After [Walter]'s vehicle was abandoned and petitioners hitchhiked to [the motel] in Santa Nella, Ward and Jones got into a fight and Ward rented a separate room. She and Jones made up about two hours later. Jones indicated that there was a man [Glenn] checking into the motel and that they could get his car to take back to Sacramento. They then waited until [Glenn] came out of the office, followed him around to his room at the

9.

back of the motel, and entered his room. When Ward went in, she saw Jones struggling with [Glenn]. At Jones's direction, she shut the door and put her hand over [Glenn]'s mouth. She got blood on her while [petitioner] was hitting [Glenn] with the gun. After [petitioner] struck [Glenn], Ward saw he was not moving. She then returned to her room and washed off the blood. Ultimately, she got into the car with Jones and [petitioner] and they drove back to Sacramento. [Glenn]'s checkbook and four credit cards were subsequently found in Jones's and Ward's residence." (*Malone v. Superior Court* (May 4, 1999) F031234, F031970, opn. ordered nonpub. July 21, 1999, fns. omitted (*Malone*).)

On April 9, 1998, the Kern County District Attorney filed an information charging petitioner with the attempted murder of Terry S. (§§ 187, subd. (a), 664); count 1), with a firearm enhancement (§ 12022.5, subd. (a)); the first degree murder of Walter P. (§ 187, subd. (a); count 5), with the special circumstances petitioner committed more than one offense of murder in the first or second degree (§ 190.2, subd. (a)(3)) and that the murder was committed during the commission or attempted commission of robbery (§ 190.2, subd. (a)(17)(A)) and kidnapping (§ 190.2, former subd. (a)(17)(ii)); the first degree murder of Glenn N. (§ 187, subd. (a); count 9), with the special circumstances petitioner committed more than one offense of murder in the first or second degree (§ 190.2, subd. (a)(3)) and that the murder was committed during the commission or attempted commission of robbery (§ 190.2, subd. (a)(17)(A)), burglary (§ 190.2, subd. (a)(17)(G)), and carjacking (§ 190.2, former (a)(17)(xii)), along with a firearm enhancement (§ 12022.5, subd. (a)); three counts of robbery (former § 212.5, subd. (c); counts 3 (Terry), 7 (Walter); § 212.5, subd. (a); count 10 (Glenn)); two counts of carjacking (§ 215, subd. (a); counts 2 (Terry), 12 (Glenn)); one count of kidnapping (§ 207, subd. (a); count 8 (Walter)); one count of kidnapping during the commission of a carjacking (§ 209.5, subd. (a); count 4 (Terry)); first degree burglary (§§ 459, 460, subd. (a); count 11 (Glenn)); and two counts of unauthorized use a of vehicle (Veh. Code, § 10851, subd. (a); counts 6 (Walter), 13 (Glenn)). As to counts 1, 2, 3, 4, 10, 11, and 12,

10.

petitioner was also charged with firearm enhancements (§ 12022.5, subd. (a) & (a)(2)). (*Malone*, *supra*, F031234, F031970.)

On September 17, 1999, petitioner pled nolo contendere to two counts of premeditated first degree murder (§§ 187, subd. (a), 189; counts 5, 9) and admitted the firearm enhancement as to count 9, and all but one special circumstance[8]; one count of premeditated attempted murder (§§ 187, subd. (a), 189, 664; count 1) with the firearm enhancement (§ 12022.5, subd. (a)); one count of first degree robbery (§ 212.5, subd. (a); count 10); two counts of second degree robbery (former § 212.5, subd. (c); counts 3, 7) and admitted the firearm enhancement (§ 12022.5, subd. (a)) as to counts 3 and 10; two counts of carjacking (§ 215, subd. (a); counts 2, 12) and admitted the firearm enhancement (§ 12022.5, subd. (a)) as to count 12; two counts of kidnapping (§§ 209.5, 207, subd. (a); counts 4, 8) and admitted a firearm enhancement (§ 12022.5, subd. (a)) as to count 4; and first degree burglary (§§ 459, 460, subd. (a); count 11) with the firearm enhancement (§ 12022.5, subd. (a)). The district attorney dismissed counts 6 (Veh. Code, § 10851, subd. (a)) and 13 (Veh. Code, § 10851, subd. (a)) in light of the plea.

On October 29, 1999, the trial court sentenced petitioner on count 9 to a term of life without the possibility of parole and imposed a consecutive 10-year term for the firearm enhancement (§ 12022.5, subd. (a)). On count 5, the trial court sentenced petitioner to a concurrent term of life without the possibility of parole. On count 1, the trial court sentenced petitioner to a concurrent term of life with the possibility of parole and imposed a 10-year term for the firearm enhancement (§ 12022.5, subd. (a)). As to count 2, the trial court sentenced petitioner to an upper term of nine years and imposed a 10-year term for the firearm enhancement (§ 12022.5, former subd. (a)(2)), but stayed the sentence pursuant to section 654. As to count 3, the trial court sentenced petitioner to the

---

[8] As to count 9, the special circumstance which alleged that petitioner was convicted of more than one offense of murder in the first or second degree (§ 190.2, subd. (a)(3)), was stricken by the court.

upper term of five years and imposed a 10-year term for the firearm enhancement (§ 12022.5, subd. (a)), but stayed the sentence pursuant to section 654. As to count 4, the trial court sentenced petitioner to a concurrent term of life with the possibility of parole and imposed a 10-year term for the firearm enhancement (§ 12022.5, subd. (a)). As to count 7, the trial court sentenced petitioner to the upper term of five years, but stayed the sentence pursuant to section 654. As to count 8, the trial court sentenced petitioner to the upper term of eight years to be served concurrent with count 9. As to count 10, the trial court sentenced petitioner to the upper term of six years and imposed a 10-year term for the firearm enhancement (§ 12022.5, subd. (a)), but stayed the sentence pursuant to section 654. As to count 11, the trial court sentenced petitioner to the upper term of six years and imposed a 10-year term for the firearm enhancement (§ 12022.5, subd. (a)), but stayed the sentence pursuant to section 654. As to count 12, the trial court sentenced petitioner to the upper term of nine years and imposed a 10-year term for the firearm enhancement (§ 12022.5, former subd. (a)(2)), to be served concurrent with count 9.

On July 18, 2019, petitioner, in propria persona, filed a petition for resentencing on her murder convictions pursuant to section 1170.95.[9] In the form petition, petitioner stated a complaint, information, or indictment was filed against her that allowed her to be prosecuted under a theory of felony murder or murder under the natural and probable consequences doctrine; she pled guilty or no contest to first or second degree murder in lieu of going to trial because she believed she could have been convicted of first or second degree murder at trial pursuant to the felony-murder rule or the natural and

[9] Petitioner did not seek resentencing on her conviction for attempted murder. Section 1170.95 has been amended, effective January 1, 2022, to expressly permit resentencing on persons convicted of attempted murder under certain circumstances. (Sen. Bill No. 775 (2021-2022 Reg. Sess.) (Senate Bill No. 775); Stats. 2021, ch. 551, §§ 1-2.) As the issue of petitioner's attempted murder conviction was not raised below, we do not address it. Petitioner may file a petition for resentencing on her attempted murder conviction in the trial court, if desired. Petitioner retains any remedies available to her in the trial court.

12.

probable consequences doctrine; and she could not now be convicted of first or second degree murder because of changes made to sections 188 and 189, effective January 1, 2019. She requested the court appoint counsel during the resentencing process and stated she could not now be convicted of first degree felony murder because she was not the actual killer; she did not, with the intent to kill, aid, abet, counsel, command, induce, solicit, request, or assist the actual killer in the commission of murder in the first degree; she was not a major participant in the felony or did not act with reckless indifference to human life during the course of the crime or felony; the victim of murder was not a peace officer in the performance of his or her duties; and that she was convicted of second degree murder under the natural and probable consequences doctrine or under the second degree felony murder doctrine and could not now be convicted because of changes to section 188, effective January 1, 2019. Lastly, she stated there was a prior determination by a court or jury that found that she was not a major participant and/or did not act with reckless indifference to human life.

The People filed a motion to dismiss arguing that Senate Bill No. 1437 (2017-2018 Reg. Sess.) (Senate Bill No. 1437) is unconstitutional, and petitioner filed a reply arguing the constitutionality of Senate Bill No. 1437. The People also filed an opposition to the petition on the merits, arguing the special circumstance findings established petitioner was a major participant in the felony who acted with reckless indifference to human life, rendering her ineligible for resentencing. The trial court ruled that Senate Bill No. 1437 is constitutional and ordered additional briefing by the parties on petitioner's eligibility for resentencing pursuant to section 1170.95. Petitioner then filed a reply to the People's opposition and the People filed a reply arguing petitioner's ineligibility for resentencing.

On August 10, 2020, the trial court denied petitioner's petition for resentencing pursuant to section 1170.95 without providing a statement of reasons.

A timely appeal followed.

13.

## DISCUSSION

### I.     Applicable Law

Effective January 1, 2019, the Legislature passed Senate Bill No. 1437 "to amend the felony murder rule and the natural and probable consequences doctrine . . . to ensure that murder liability is not imposed on a person who is not the actual killer, did not act with the intent to kill, or was not a major participant in the underlying felony who acted with reckless indifference to human life." (Stats. 2018, ch. 1015, § 1, subd. (f).)  The bill accomplished this task by adding three separate provisions to the Penal Code.  (*People v. Gentile* (2020) 10 Cal.5th 830, 842 (*Gentile*).)  First, to amend the natural and probable consequences doctrine, the bill added section 188, subdivision (a)(3), which requires a principal to act with malice aforethought before he or she may be convicted of murder. (§ 188, subd. (a)(3); accord, *Gentile*, at pp. 842-843.)  Second, to amend the felony-murder rule, the bill added section 189, subdivision (e):

> "A participant in the perpetration or attempted perpetration of [qualifying felonies] in which a death occurs is liable for murder only if one of the following is proven:  [¶]  (1) The person was the actual killer.  [¶]  (2) The person was not the actual killer, but, with the intent to kill, aided, abetted, counseled, commanded, induced, solicited, requested, or assisted the actual killer in the commission of murder in the first degree.  [¶]  (3) The person was a major participant in the underlying felony and acted with reckless indifference to human life, as described in subdivision (d) of Section 190.2."[10]  (§ 189, subd. (e); accord, *Gentile*, at p. 842.)

Finally, the bill added section 1170.95 to provide a procedure for those convicted of a qualifying offense "to seek relief under the two ameliorative provisions above."  (*Gentile*, at p. 843.)  This procedure is available to persons convicted of "felony murder or murder under the natural and probable consequences doctrine or other theory under which malice is imputed to a person based solely on that person's participation in a crime, attempted

---

[10] Additionally, section 189 was amended to allow for felony-murder liability where the victim is a peace officer.  (§ 189, subd. (f); accord, *People v. Daniel* (2020) 57 Cal.App.5th 666, 672.)

14.

murder under the natural and probable consequences doctrine, or manslaughter." (§ 1170.95, subd. (a).)

"Section 1170.95 lays out a process" for a person convicted of one of the aforementioned offenses "to seek vacatur of his or her conviction and resentencing." (*Gentile*, *supra*, 10 Cal.5th at p. 853.) First, an offender must file a petition in the sentencing court averring that:

> "(1) A complaint, information, or indictment was filed against the petitioner that allowed the prosecution to proceed under a theory of felony murder, murder under the natural and probable consequences doctrine or other theory under which malice is imputed to a person based solely on that person's participation in a crime, or attempted murder under the natural and probable consequences doctrine[;]

> "(2) The petitioner was convicted of murder, attempted murder, or manslaughter following a trial or accepted a plea offer in lieu of a trial at which the petitioner could have been convicted of murder or attempted murder[; and]

> "(3) The petitioner could not presently be convicted of murder or attempted murder because of changes to Section 188 or 189 made effective January 1, 2019." (§ 1170.95, subd. (a)(1)-(3); see § 1170.95, subd. (b)(1)(A); accord, *People v. Lewis* (2021) 11 Cal.5th 952, 959-960 (*Lewis*).)

Additionally, the petition shall state "[w]hether the petitioner requests the appointment of counsel." (§ 1170.95, subd. (b)(1)(C).)

If a petition fails to contain the required information and the information cannot be "readily ascertained" by the court, the petition may be denied without prejudice to the filing of another petition. (§ 1170.95, subd. (b)(2).) Otherwise, counsel must be appointed, if requested. (§ 1170.95, subd. (b)(3).) The prosecutor must file a response and the petitioner may file a reply. The trial court must then hold a hearing to determine if the petitioner has made a prima facie showing that he or she is entitled to relief. (§ 1170.95, subd. (c); accord, *Lewis*, *supra*, 11 Cal.5th at pp. 961-963, 967.) In making this determination, the court may rely on the record of conviction. (*Lewis*, at pp. 970-

971.)  The record of conviction includes, but is not limited to, jury instructions and verdict forms.  (See generally *id*. at p. 972.)  However, the prima facie inquiry is limited and, at this stage of the proceedings, the court "should not engage in 'factfinding involving the weighing of evidence or the exercise of discretion.' "  (*Id*. at pp. 971-972.)

If the court determines the petitioner has met his or her prima facie burden, "the trial court must issue an order to show cause and hold a hearing to determine whether to vacate the murder[, attempted murder, or manslaughter] conviction and to resentence the petitioner on any remaining counts."  (*Gentile*, *supra*, 10 Cal.5th at p. 853; accord, § 1170.95, subds. (c), (d)(1).)  At the hearing, the prosecution must "prove, beyond a reasonable doubt, that the petitioner is ineligible for resentencing."  (§ 1170.95, subd. (d)(3).)  The prosecutor and the petitioner may offer new or additional evidence to meet their respective burdens.  The admission of evidence at the hearing is governed by the Evidence Code.  However, the court also "may consider evidence previously admitted at any prior hearing or trial that is admissible under current law, including witness testimony, stipulated evidence, and matters judicially noticed," as well as the "procedural history of the case recited in any prior appellate opinion."  (§ 1170.95, subd. (d)(3).)  Hearsay evidence that was admitted in a preliminary hearing pursuant to subdivision (b) of section 872 is inadmissible at the evidentiary hearing, unless made admissible by another exception to the hearsay rule.  (§ 1170.95, subd. (d)(3).)

To demonstrate prejudice from the denial of a section 1170.95 petition before the issuance of an order to show cause, the petitioner must show it is reasonably probable that, absent error, his or her petition would not have been summarily denied without an evidentiary hearing.  (*Lewis*, *supra*, 11 Cal.5th at pp. 972-974; see *People v. Watson* (1956) 46 Cal.2d 818, 836.)

## II.    Analysis

Petitioner contends the trial court violated her due process rights by failing to issue an order to show cause and failing to hold a hearing before engaging in judicial

factfinding. Additionally, petitioner contends the trial court violated her due process rights by engaging in premature factfinding at the prima facie stage. Petitioner further contends the trial court erred by failing to provide a statement of reasons for denying the petition without issuing an order to show cause, which is now required under section 1170.95, subdivision (c). Lastly, petitioner contends the special circumstance findings cannot establish her ineligibility for resentencing because the law regarding felony murder has changed since her plea.

Although the trial court failed to follow the procedures outlined in section 1170.95, subdivision (c), we conclude any error was harmless because petitioner admitted numerous special circumstance findings that establish she is ineligible for resentencing as a matter of law.

A.    Petitioner Did Not Have a Constitutional Right to an Order to Show Cause Hearing.

Petitioner contends the trial court violated her due process rights by failing to issue an order to show cause and failing to hold a hearing before engaging in judicial factfinding. We disagree.

Due process is implicated when the state attempts to deprive a defendant of some liberty interest. (*Hewitt v. Helms* (1983) 459 U.S. 460, 466, abrogated on another point by *Sandin v. Conner* (1995) 515 U.S. 472, 483, fn. 5.) But, as we discuss below, petitioner is "categorically ineligible for relief under section 1170.95." (*People v. Tarkington* (2020) 49 Cal.App.5th 892, 908, abrogated on another ground in *Lewis*, *supra*, 11 Cal.5th at pp. 962-963.) Therefore, petitioner has no liberty interest in any of the procedures afforded by section 1170.95, subdivision (c). (See *Tarkington*, at p. 908.)

B.    The Trial Court Did Not Engage in Premature Judicial Factfinding.

Petitioner further contends the trial court denied the petition based on premature judicial factfinding. Because the trial court denied the petition without issuing a statement of reasons, it is unclear what materials the trial court relied on and what

17.

conclusions it drew in determining petitioner is ineligible for resentencing. To the extent the trial court engaged in judicial factfinding at the prima facie review, the court erred. (*Lewis*, *supra*, 11 Cal.5th at p. 972.)

C.    Senate Bill No. 775.

Petitioner further contends that Senate Bill No. 775 applies to this case and the trial court erred in failing to provide a statement of reasons for denying the petition without issuing an order to show cause, which is now required under section 1170.95, subdivision (c). The People concede that Senate Bill No. 775 applies to this case. We accept the People's concession, but as we discuss below, we conclude petitioner was not prejudiced by the trial court's error.

Effective January 1, 2022, the Legislature enacted Senate Bill No. 775, which amended section 1170.95. (Stats. 2021, ch. 551, § 2.) Section 1170.95 was amended, in pertinent part, to state:

> "After the parties have had an opportunity to submit briefings, the court shall hold a hearing to determine whether the petitioner has made a prima facie case for relief. If the petitioner makes a prima facie showing that the petitioner is entitled to relief, the court shall issue an order to show cause. *If the court declines to make an order to show cause, it shall provide a statement fully setting forth its reasons for doing so.*" (§ 1170.95, subd. (c), italics added; accord, Senate Bill No. 775; Stats 2021, ch. 551, § 2.)

Here, the petition was filed and denied prior to the enactment of Senate Bill No. 775. However, the amended statute applies since petitioner's case is not yet final. (See *People v. Montes* (2021) 71 Cal.App.5th 1001, 1006-1007.) Here, the trial court erred by summarily denying the petition without setting forth the reasons for why it did not issue an order to show cause, which is now required under section 1170.95, subdivision (c).

D.    Petitioner was not Prejudiced by the Trial Court's Error.

Finally, although we conclude the trial court erred in failing to comply with the procedures outlined in section 1170.95, subdivision (c), we conclude petitioner was not prejudiced by the error because the record establishes she is ineligible for resentencing as

18.

a matter of law. (See *Lewis*, *supra*, 11 Cal.5th at pp. 972-974; see also *People v. Watson*, *supra*, 46 Cal.2d at p. 836.)

To be eligible for relief pursuant to section 1170.95, petitioner must not have been the actual killer, must not have acted with the intent to kill or malice aforethought, and must not have been a major participant in the underlying felony who acted with reckless indifference to human life. (§§ 188, subd. (a)(3), 189, subd. (e), 1170.95, subd. (a)(3); see *Gentile*, *supra*, 10 Cal.5th at p. 842.) Here, as to count 5, petitioner admitted the robbery (§ 190.2, subd. (a)(17)(A)) and kidnapping (§ 190.2, former subd. (a)(17)(ii)) special circumstances.[11] As to count 9, petitioner admitted the robbery (§ 190.2, subd. (a)(17)(A)), burglary (§ 190.2, subd. (a)(17)(G)), and carjacking (§ 190.2, former subd. (a)(17)(xii)) special circumstances. These special circumstances apply where a defendant has acted "with reckless indifference to human life and as a major participant" in aiding and abetting the commission of the underlying felony. (§ 190.2, subd. (d); *People v. Gutierrez-Salazar* (2019) 38 Cal.App.5th 411, 419.) In other words, "[t]he language of the special circumstance tracks the language of Senate Bill [No.] 1437 and the new felony-murder statutes." (*Gutierrez-Salazar*, at p. 419.) By admitting these special circumstances, as a part of her nolo contendere plea, petitioner admitted that she acted "with reckless indifference to human life and as a major participant" in aiding and abetting the commission of the underlying felony. (See *People v. Palacios* (1997) 56 Cal.App.4th 252, 257 [a nolo contendere plea admits all elements and " 'all allegations and factors comprising the charge contained in the pleading' "].) Therefore, petitioner's

_____

[11] Although not argued by either party, petitioner also admitted the special circumstance that she was convicted of more than one offense of murder in the first or second degree (§ 190.2, subd. (a)(3)). By admitting this special circumstance, petitioner admitted she was either the actual killer or aided and abetted in the murder with intent to kill. (§ 190.2, subds. (a)(3), (b), (c).) Accordingly, the multiple-murder special circumstance also establishes petitioner's ineligibility for resentencing as a matter of law. (§§ 188, subd. (a)(3), 189, subd. (e), 1170.95, subd. (a)(3); see *Gentile*, *supra*, 10 Cal.5th at p. 842.)

special circumstance admissions establish that she could still be convicted of first degree murder under the law, as amended by Senate Bill No. 1437.

Nevertheless, petitioner argues the special circumstance findings, standing alone, are insufficient to render her ineligible for resentencing as a matter of law. In support, she relies on *People v. Banks* (2015) 61 Cal.4th 788 and *People v. Clark* (2016) 63 Cal.4th 522, both decided after her conviction was final. "*Banks* and *Clark* 'clarified "what it means for an aiding and abetting defendant to be a 'major participant' in a crime who acted with a 'reckless indifference to human life.' " ' [Citation.] *Banks* identified certain factors to consider in determining whether a defendant was a major participant; *Clark* identified factors to guide the determination of whether the defendant acted with reckless indifference to human life." (*People v. Gomez* (2020) 52 Cal.App.5th 1, 13, fn. 5, review granted Oct. 14, 2020, S264033 (*Gomez*).) Courts of Appeal are split on the question of whether a special circumstance finding entered prior to *Banks* and *Clark* renders a petitioner ineligible for section 1170.95 resentencing relief as a matter of law (see *People v. Jones* (2020) 56 Cal.App.5th 474, 478-479, review granted Jan. 27, 2021, S265854 (*Jones*) [collecting cases]), and our Supreme Court has granted review to decide the issue (*People v. Strong* (Dec. 18, 2020, C091162) [nonpub. opn.], review granted Mar. 10, 2021, S266606).

This court has concluded that a special circumstance finding entered prior to *Banks* and *Clark* precludes relief as a matter of law. (*People v. Simmons* (2021) 65 Cal.App.5th 739, 748-749, review granted Sept. 1, 2021, S270048.) In so doing, we held that *Banks* and *Clark* did not state a new rule of law but rather illuminated factors a fact finder might consider in determining whether a defendant was a major contributor who acted with reckless indifference to human life. (*Simmons*, at p. 749.) Although we recognize review has been granted in *Simmons*, we see no reason to depart from our analysis and conclusions therein. The principles illuminated in *Banks* and *Clark* existed when petitioner admitted the robbery (§ 190.2, subd. (a)(17)(A)) and kidnapping

(§ 190.2, former subd. (a)(17)(ii)) special circumstances as to count 5 and when she admitted the robbery (§ 190.2, subd. (a)(17)(A)), burglary (§ 190.2, subd. (a)(17)(G)), and carjacking (§ 190.2, former subd. (a)(17)(xii)) special circumstances as to count 9. We have no basis to conclude petitioner or the court understood these terms differently at the time of her plea.  Accordingly, petitioner is unable to establish a prima facie showing she is entitled to resentencing relief because she is ineligible for resentencing relief as a matter of law.

## DISPOSITION

The order denying petitioner's section 1170.95 petition is affirmed.

21.